IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-03150-MSK-KLM

DOUGLAS LARSON, in his capacity as Bankruptcy Trustee for the Estate of Cynthia
Coreyn Tester-Lamar,

      Plaintiff,

v.

ONE BEACON INSURANCE COMPANY,

      Defendant.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendant's **Motion to Dismiss** [Docket No. 12;

Filed December 18, 2012] (the "Motion").   On February 5, 2013, the Court converted

Defendant's Motion into a motion for summary judgment.   *Minute Order* [#25].   Plaintiff

timely filed a Response [#52] in opposition to the Motion on July 17, 2013.   On August 1,

2013, Defendant filed a Reply [#55].   Pursuant to 28 U.S.C. § 636(b)(1)(A) and

D.C.COLO.LCivR 72.1C, the Motion has been referred to this Court for a recommendation

regarding disposition [#16].   The Court has reviewed the Motion, the Response, the Reply,

the entire case file, and the applicable law, and is sufficiently advised in the premises.   For

the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motion [#12]

be **GRANTED in part and DENIED without prejudice in part**.

## I. Summary of the Case[1]

As stated by Defendant in the Motion, the underlying facts in this case are complex. *Motion* [#12] at 1.  Involved in this matter are five separate legal actions, consisting of three in state court, one in bankruptcy court, and the present federal district court action.  The relevant facts begin with Cynthia Coreyn Tester-Lamar ("Tester-Lamar" or the "Debtor") and her law firm, Tester-Lamar & Associates, PC (the "Firm"), when Ms. Tester-Lamar represented Christine Ferer ("Ferer") and ChrisPat Aspen LLC ("ChrisPat") in two actions in 2007 and 2008.  The first was a construction defect case (the "Fenton Action") and the second was an architect malpractice arbitration (the "Gibson Action").

Plaintiff asserts that Ms. Tester-Lamar had serious problems with drugs and alcohol throughout the time she represented Ms. Ferer and ChrisPat.  *Response* [#52] at 3.  Ms. Tester-Lamar's staff reported that she often drank vodka throughout the day and would become intoxicated at work.  *Pl.'s Ex. 1, Depo. of Elkin* [#52-1] at 13-15, 38-41, 63; *Pl.'s Ex. 2, Depo. of Davis* [#52-2] at 23-27, 39-41; *Pl.'s Ex. 3, Depo. of Bihl* [#52-3] at 17-20.  Her employees found vodka bottles throughout Ms. Tester-Lamar's office and reported that she sometimes slurred her words and stumbled.  *See id.*  One employee further stated that she saw lines of a white powdery substance on Ms. Tester-Lamar's desk and suspected her of cocaine use during business hours.  *Pl.'s Ex. 3, Depo. of Bihl* [#52-3] at 23.  Ms. Tester-Lamar's staff was concerned that her drug and alcohol use affected her ability to

---

[1] The following facts are stated only for the purpose of deciding the Motion presently before the Court.  Phase II discovery is now underway in this matter and may affect the facts as presently submitted by the parties and here summarized by the Court.  *See Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990) ("When reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party.").

practice law. *Pl.'s Ex. 1, Depo. of Elkin* [#52-1] at 13-15, 38-41, 63; *Pl.'s Ex. 2, Depo. of Davis* [#52-2] at 23-27, 39-41; *Pl.'s Ex. 3, Depo. of Bihl* [#52-3] at 17-20.   Ms. Tester-Lamar consistently postponed cases, missed deadlines, and asked her staff to engage in what they considered questionable conduct; for example, she once instructed her receptionist to call into a mediation on her behalf because she was having plastic surgery that day and was using money from the firm's operating account for the surgery. *Pl.'s Ex. 1, Depo. of Elkin* [#52-1] at 13-15, 38-41, 63; *Pl.'s Ex. 2, Depo. of Davis* [#52-2] at 23-27, 39-41; *Pl.'s Ex. 3, Depo. of Bihl* [#52-3] at 17-20, 24-26.

Financially, Ms. Tester-Lamar's firm struggled and was funded in large part by her husband. *Pl.'s Ex. 1, Depo. of Elkin* [#52-1] at 16-19; *Pl.'s Ex. 2, Depo. of Davis* [#52-2] at 30-33. At one time, Ms. Tester-Lamar asked Ms. Ferer to loan the Firm money as an advance on its contingent fee in order to pay for experts in the Fenton and Gibson Actions. *Pl.'s Ex. 1, Depo. of Elkin* [#52-1] at 25-30. At least one member of her staff believed that Ms. Tester-Lamar was using the loaned funds to keep the Firm afloat rather than to pay experts, and she did not believe that Ms. Tester-Lamar would repay the loan. *Id.*

Between August 17, 2008, and January 26, 2009, Ms. Tester-Lamar spent approximately four months in various in-patient rehabilitation facilities, where she had little or no access to a telephone. *Pl.'s Ex. 4, Notice of Hospitalization* [#52-4]; *Pl.'s Ex. 5, Depo. of D'Arcy* [#52-5] at 63-64. Intake records at one facility recorded the presence of alcohol, cocaine, marijuana, and narcotic prescription drugs in her blood. *Pl.'s Ex. 6, Combined Investigation Report* [#52-6]. During these extended absences, Ms. Tester-Lamar instructed her staff to inform clients that she had an eating disorder and was out of the office being treated for diverticulitis. *Pl.'s Ex. 5, Depo. of D'Arcy* [#52-5] at 50-51. Ms.

Ferer and many other clients who called or emailed during that period were given misleading information about Ms. Tester-Lamar's whereabouts and the progress on their respective cases. *Id.* at 116-118.  For example, Ms. Tester-Lamar told Ms. Ferer that she was preparing for an arbitration when, instead, Ms. Tester-Lamar was preparing to enter a rehabilitation program for drug and alcohol abuse and had not properly commenced the arbitration process. *Pl.'s Ex. 7, Various August 2008 Emails* [#52-7].

After multiple clients and staff members filed formal grievances against her, Ms. Tester-Lamar surrendered her license to practice law in a stipulated admission of misconduct. *Pl.'s Ex. 8, Admission of Misconduct* [#52-8].  Ms. Ferer was forced to represent herself and ChrisPat at a pretrial hearing in the Fenton Action, and the court entered sanctions against Ms. Tester-Lamar when it learned of her conduct:

> Everybody's being hurt by Ms. Tester-Lamar's actions and her failure to, what I'm going to call "adequately protect her client."  I'm deeply troubled that the first time you learned about this, Ms. Ferer, was in October.  That matter was not handled appropriately in my humble opinion, by Ms. Tester-Lamar. She should have notified all of her clients right away that she was having these medical or psychological issues . . . .  I'm going to enter sanctions against Ms. Tester-Lamar for her handling of the matter.  And I mean her failure to notify in a timely manner her client, the Court, [and] defense counsel.  She did so irresponsibly, and in my opinion, contrary to the Rules of Professional Responsibility.

*Pl.'s Ex. 9, Dec. 8, 2008 Hearing Transcript* [#52-9].

Plaintiff asserts that Ms. Tester-Lamar's "miscreant actions" negatively impacted the Fenton and Gibson Actions. *Response* [#52] at 5.  Concerning the Fenton Action, Ms. Tester-Lamar failed to adequately coordinate expert witnesses, and the court limited the retention of new experts after it imposed sanctions. *Pl.'s Ex. 10, Disclosure of Expert Opinions* [#52-10]; *Pl.'s Ex. 11, Expert Report of Gray* [#52-11].  Plaintiff also asserts that:

(1) while Ms. Ferer and ChrisPat eventually retained new counsel, they could not do so on a contingent fee basis, resulting in their payment of attorney fees; (2) Ms. Ferer and ChrisPat did not prevail at trial in large part due to Ms. Tester-Lamar's negligence; (3) Ms. Ferer and ChrisPat were forced to settle the Gibson Action for a greatly reduced amount because Ms. Tester-Lamar had missed a critical statute of limitations; and (4) Ms. Ferer and ChrisPat's subsequent attorneys, as well as an independent, "well-respected" attorney, believe that Ms. Tester-Lamar's representation significantly and materially harmed the Fenton and Gibson Actions. *See id.*

Based on the foregoing, Ms. Ferer and ChrisPat brought a malpractice action against Ms. Tester-Lamar and the Firm in 2010 in a case styled *Christine Ferer and ChrisPat Aspen, LLC v. Tester-Lamar & Associates, PC and Cynthia Tester-Lamar*, Pitkin County Case No. 2010-CV-327 (the "Pitkin County Action"). *See Pl.'s Ex. 12, Compl. in Pitkin Cnty. Action* [#52-12]. Ms. Ferer and ChrisPat alleged that Ms. Tester-Lamar and her Firm breached their fiduciary duties and engaged in multiple acts of professional negligence in the prosecution of the Fenton and Gibson Actions. *Id.* At the time of their representation of Ms. Ferer and ChrisPat, Ms. Tester-Lamar and the Firm were insured under a Lawyers' Professional Liability Insurance Policy, No. LAP-1288-08, issued by Defendant in the instant lawsuit, with liability limits of $1,000,000 (the "Policy"). *Def.'s Ex. A, Insurance Policy* [#12-1]. Pursuant to its obligations under the Policy, Defendant hired defense counsel for Ms. Tester-Lamar and the Firm in the Pitkin County Action. *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶ 3.

After filing the complaint and making initial disclosures in the Pitkin County Action, Ms. Ferer and ChrisPat made a time-limited demand to settle their claims against Ms.

Tester-Lamar and the Firm for the Policy's remaining limits, despite having identified damages in excess of $2,000,000. *See Pl.'s Ex. 13, Demand Letter* [#52-13]; *Pl.'s Ex. 14, Initial Disclosures* [#52-14]. At this time and throughout the Pitkin County Action, Ms. Tester-Lamar remained "strongly opposed" to settlement. *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶ 4. She specifically instructed Defendant to reject Ms. Ferer and ChrisPat's $1,000,000 settlement offer. *Id.* Defendant thus did not respond to the settlement offer. *Pl.'s Ex. 15, Rule 30(b)(6) Depo. of Def.* [#52-15] at 95-96.

As the litigation proceeded, Ms. Ferer and ChrisPat provided supplemental disclosures in 2010 and 2011 to Ms. Tester-Lamar and the Firm demonstrating damages in excess of $4,600,000. *Response* [#52] at 6. This sum was in line with Ms. Tester-Lamar's prior valuation of the Fenton and Gibson Actions. *Pl.'s Ex. 16, Notice of Claim filed by Ms. Tester-Lamar* [#52-16]. On December 29, 2011, Ms. Ferer and ChrisPat again offered to settle their claims for $1,000,000. *Pl.'s Ex. 17, Statutory Offer of Settlement* [#52-17]. Ms. Tester-Lamar again instructed Defendant to reject the settlement offer. *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶ 5. As a result, Defendant again did not respond. *Pl.'s Ex. 15, Rule 30(b)(6) Depo. of Def.* [#52-15] at 95-96.

Ms. Tester-Lamar's retained counsel advised Defendant in three separate reports that he believed that Defendant had potential exposure in excess of the Policy limits based on Ms. Tester-Lamar and the Firm's violation of several canons of ethics and other duties owed to Ms. Ferer and ChrisPat. *Pl.'s Ex. 18, Claim Reports* [#52-18]. Her counsel also noted that Ms. Tester-Lamar's conduct "[c]ould prove problematic at trial, as there is a real risk a jury could construe her misconduct as prima facie proof of malpractice." *Id.* at 15. Her counsel believed that the jury would return a defense verdict, but he also informed

Defendant that if the jury found in favor of Ms. Ferer and ChrisPat, the verdict could exceed the Policy limits. *Id.* at 17. Ms. Tester-Lamar, however, at no time believed that she had any liability to Ms. Ferer or ChrisPat or that she was exposed to an adverse judgment in excess of the Policy limits. *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶¶ 6-7.

Ms. Tester-Lamar filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Colorado, Case No. 12-13730-SBB (the "Bankruptcy Action") on March 1, 2012, a few days before her scheduled deposition in the Pitkin County Action. *Id.* ¶ 10. Ms. Tester-Lamar asserts that her bankruptcy filing did not result from the Pitkin County Action. *Id.* ¶ 11. Plaintiff in the present matter was appointed as the trustee of Ms. Tester-Lamar's estate. *Pl.'s Ex. 19, Decl. of Larson* [#52-19]. Plaintiff chose to negotiate and eventually enter into a compromise settlement with Ms. Ferer and ChrisPat based on the Trustee's belief regarding Ms. Tester-Lamar's exposure to judgment in the Pitkin County Action and Defendant's failure to respond to the two Policy-limit settlement offers previously made by Ms. Ferer and ChrisPat. *Pl.'s Ex. 20, Settlement Agreement* [#52-20]. Ms. Tester-Lamar did not participate in the negotiation of the compromise settlement and did not give her consent to the final agreement. *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶ 12.

The Bankruptcy Judge approved the agreement, stating that:

The trustee seems to be acting, and the Court would conclude he is acting, in the best interests of the estate. It would appear, based on the evidence proffered and the documents I have examined, that the [settlement] agreement is in the best interests of the estate. . . . I would conclude further that, based on the evidence, that this appears to be a product of arms-length negotiations between the estate and Ms. Ferer . . . . The Court is persuaded that this agreement should be approved, that it is in the best interests of the estate, and there are no sound or persuasive reasons which would bar the estate going forward with this agreement, wherever that may lead in the

future.

*Pl.'s Ex. 21, Partial Transcript of Bankr. Court Evidentiary Hearing* [#52-21].  Based on the bankruptcy proceedings, judgment was subsequently entered in the Pitkin County Action in favor of Ms. Ferer and ChrisPat and against Ms. Tester-Lamar in the amount of $4,500,000.  *Response* [#52] at 8.  Ms. Tester-Lamar, however, did not believe that the settlement was designed to protect her from further adverse consequences or that the $4.5 million settlement amount reflected a reasonable estimation of the damages asserted in the Pitkin County Action.  *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-1] ¶¶ 13-14.

The Trustee thereafter initiated the present action against Defendant for breach of contract and for bad faith conduct in failing to act reasonably in handling the Pitkin County Action.  *Response* [#52] at 8.  Ms. Tester-Lamar's opinion is that neither she nor the Trustee ever had any claims against Defendant for breach of contract, bad faith breach of contract, or violation of any statute based on Defendant's handling of the Pitkin County Action.  *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-1] ¶¶ 8, 15.  She states that she did not suffer any emotional distress or other mental anguish as a result of Defendant's handling of that lawsuit.  *Id.* ¶ 9.  Ms. Tester-Lamar further avers that, in her view: (1) Defendant never breached its duties of good faith and fair dealings; (2) Defendant did not refuse to properly investigate and evaluate Ms. Ferer and ChrisPat's claims; (3) Defendant did not fail to, in good faith, effectuate a prompt, fair and equitable settlement of the Pitkin County Action because her liability there was never reasonably clear; (4) Defendant's refusal to timely offer the limits of the Policy to settle the Pitkin County Action was reasonable; (5) Defendant did not deprive Ms. Tester-Lamar or her Firm of the benefits and/or protection of the Policy; and (6) Defendant did not put its interests ahead of Ms. Tester-Lamar's or the

Firm's.  *Id.* ¶ 17.

## II.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law.  *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323).  When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* at 671.  If the movant carries the initial burden of making a *prima facie* showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor.  *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most

favorable to him. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

### III.  Analysis

**A.  Claim One: Breach of Contract**

Defendant contends that it is entitled to summary judgment in its favor because undisputed facts demonstrate that it did not breach the underlying insurance contract. To succeed on a breach of contract claim in Colorado, a plaintiff must prove the following elements: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *Sewell v. Safeco Ins. Co. of Am.*, No. 06-cv-000150-EWN-MJW, 2007 WL 2071617, at *6 (D. Colo. July 19, 2007) (citing *SGI Air Holdings II LLC v. Novartis Int'l AG*, 239 F. Supp. 2d 1161, 1170 (D. Colo. 2003)). The parties do not dispute that Ms. Tester-Lamar and Defendant entered into an insurance contract that covered Ms. Tester-Lamar in the event of legal action against her on the basis of malpractice.

At the outset, the Court must note that the parties have succeeded in muddying the straight-forward legal issues in this matter by arguing about the complex facts underlying

this case, in no small part because Plaintiff has failed to clearly differentiate between his causes of action.  According to the Complaint, Plaintiff has asserted a claim for breach of contract, *i.e.*, the Policy.  [#7] at 3.  Plaintiff has separately asserted a claim titled "bad faith breach of insurance contract."  *Id.* at 4.  However, concerning the first claim, Plaintiff fails to point out which provision of the insurance contract Defendant allegedly failed to perform.  The Complaint does not allude to any specific provision.  *See* [#7] at 3 (stating conclusorily that "among [Ms. Tester-Lamar's] estate's assets were claims against [Defendant] for breach of contract," and that "[b]y its actions, as described above, [Defendant] breached the contract of insurance").  Further, in his Response, Plaintiff again fails to direct the Court's attention to any specific provision that was breached.  In fact, the only provision mentioned is as follows:

> IV.  DUTY TO DEFEND
>
> A.  We have the right and duty to defend any claim against you seeking damages to which this insurance applies, even if any of the allegations of the suit are groundless, false or fraudulent . . .
>
> B.  We have the right to make any investigation we deem necessary and, with your written consent, make any settlement of any claim covered by the terms of this policy.  If you refuse to consent to any settlement or compromise recommended by us and acceptable to the claimant and you elect to contest the claim or continue legal proceedings in connection with such claim, then our liability under this policy will be limited to the amount for which the claim could have been settled, including the claim expenses up to the date of your refusal.  We will have no liability for claim expenses incurred thereafter and will have the right to withdraw from the further investigation and/or defense thereof by tendering control of such investigation or defense to you, and you agree, as a condition of the issuance of the policy, to accept such tender.

*Def.'s Ex. A, Insurance Policy* [#12-1] at 4.  However, Plaintiff only uses this provision to discuss the reasonableness of Defendant's actions and to attempt to demonstrate that

Defendant had multiple options in handling potential settlement with the plaintiffs in the Pitkin County Action.   *Response* [#52] at 15-16.   No facts are asserted to support a contention that Defendant breached the express terms of this provision of the contract.

Because Plaintiff points to no express provision of the insurance contract that was allegedly breached, the parties' arguments lead inescapably to the conclusion that the basis for Plaintiff's breach of contract claim is the assertion that Defendant breached the implied duty of good faith and fair dealing when it failed to settle the Pitkin County Action. The parties do in fact argue vigorously about whether Defendant breached "the Policy's implied covenant of good faith and fair dealing," which is explicitly mentioned in Plaintiff's *second* cause of action, *i.e.*, the "bad faith breach of insurance contract." *Compl.* [#7] at 4.  For example, when discussing his claim for breach of contract, Plaintiff states that "it is not the express terms of the contract that require an insurer to settle.  Instead, the duty of good faith and fair dealing implied in every contract of insurance gives rise to a correlative duty for a liability insurer to reasonably investigate and effectuate settlement in appropriate circumstances." *Response* [#52] at 9 (citations omitted).  The basis for Plaintiff's breach of contract claim is, therefore, apparently identical to the basis for Plaintiff's bad faith claim: both depend on proof of violation of the duty of good faith and fair dealing.  As fully explained below, the Court determines that Plaintiff's second claim lies in tort and not in contract, and that Plaintiff's first claim for breach of contract should be dismissed as a matter of law.

In Colorado, insurance contracts, like other commercial agreements, are subject to an implied duty of good faith and fair dealing.  *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003).  A breach of this duty in most bilateral contractual relationships

results in damages sounding in contract law and does not give rise to tort liability. *Id.* Colorado, however, is one of a minority of states that carves out an exception to this general rule with respect to insurance contracts. *See* Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, § 12.01, at 1034-35 (16th ed. 2013) (collecting cases demonstrating that a claim for bad faith breach of an insurance contract sounds only in contract law and is not recognized as a tort action in a majority of states).

Colorado views insurance contracts differently from ordinary bilateral contracts for two primary reasons. *Cary*, 68 P.3d at 466; *Huizar v. Allstate Ins. Co.*, 952 P.2d 342, 344 (Colo. 1998). First, Colorado differentiates the motivation for entering into an insurance contract, recognizing that "[i]nsureds enter into insurance contracts for the financial security obtained by protecting themselves from unforeseen calamities and for peace of mind, rather than to secure commercial advantage." *Goodson v. Am. Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 414 (Colo. 2004) (citing *Cary*, 68 P.3d at 467; *Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo. 1984)). Second, Colorado also recognizes the disparity in bargaining power between the parties to an insurance contract because it is difficult for an insured to obtain materially different coverage elsewhere, thus resulting in little or no pre-agreement bargaining. *Goodson*, 89 P.3d at 414 (citing *Huizar*, 952 P.2d at 344). Therefore, in Colorado, an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action based in tort because of the "special nature of the insurance contract and the relationship which exists between the insurer and the insured." *Goodson*, 89 P.3d at 414 (quoting *Cary*, 68 P.3d at 466).

"The basis for tort liability is the insurer's conduct in unreasonably refusing to pay a claim and failing to act in good faith, not the insured's ultimate financial liability."

*Goodson*, 89 P.3d at 414 (citing *Trimble*, 691 P.2d at 1142).  "Third-party bad faith arises when an insurance company acts unreasonably in investigating, defending, or settling a claim brought by a third person against its insured under a liability policy."  *Goodson*, 89 P.3d at 414 (citing *Farmers Grp., Inc. v. Williams*, 805 P.2d 419, 421 (Colo. 1991)). Because an insurance company stands in a position of trust with regard to its insured in the third-party context, a quasi-fiduciary relationship exists between them.  *Goodson*, 89 P.3d at 414-15 (citing *Trimble*, 691 P.2d at 1141).

Thus, in short, with this legal background in mind, the Court agrees with Defendant's statement that Plaintiff's Response to the Motion "mixes apples and oranges, fixating on [Defendant's] alleged unreasonableness—an issue relevant only to his bad faith claim—while never pointing to a policy provision [Defendant] breached or explaining how [Defendant] breached the policy."  *Reply* [#55] at 2.  The problem with Plaintiff's argument is that he treats the implied *duty* of good faith and fair dealing as an implied *term* of the contract and alleges that the implied contractual term has been breached.  However, the law does not support such a claim in the insurance context.  Rather, in the insurance context, breach of the implied duty of good faith and fair dealing gives rise to a tort claim, not a contract claim.  *Goodson*, 89 P.3d at 414.

Without a showing that an express or implied contractual term has allegedly been breached, Plaintiff's contract claim is, fundamentally, a tort claim in a contractual wrapper. *See also Sterling Constr. Mgmt., LLC v. Steadfast Ins. Co.*, No. 09-cv-0224-MSK-MJW, 2011 WL 3903074, at *6 (D. Colo. Sept. 6, 2011) (holding that where contractual issues invoke the same duties of care as does tort law, a contractual analysis is necessary to define the extent of the relationship between the insurer and insured [*i.e.*, whether coverage

by the insurer of the insured exists], but "determination of whether the contract was breached is, for all practical purposes, one of tort" and distinguishing cases that "did not involve 'contract' claims that were merely tort claims in a contractual wrapper"). Summary judgment is appropriate on the contract claim because Plaintiff has failed to show non-performance of the contract. At best, Plaintiff has alleged non-performance of a tort duty arising from the contract. As a matter of law, therefore, Plaintiff's breach of contract claim fails under the circumstances of this case.[2] *Id.*; *Cary*, 68 P.3d at 466.

Based on the foregoing, the Court finds that there is no genuine issue of material fact on Plaintiff's first cause of action and that Defendant is entitled to entry of summary judgment in its favor on the first cause of action as a matter of law. Accordingly, the Court **recommends** that Defendant's Motion [#12] be **granted** to the extent it seeks entry of

---

[2] The Court notes that the holding that Plaintiff's cause of action regarding bad faith breach of insurance contract sounds only in tort and not in contract does not limit the amount of damages available to him, should he succeed in proving the elements of his bad faith breach of insurance contract. In fact, if anything, Plaintiff has a greater range of potential recovery with a tort claim. According to *Goodson*, 89 P.3d at 415:

An insured can recover damages for bad faith breach of insurance contract based on traditional tort principles. *Lira v. Shelter Ins. Co.*, 913 P.2d 514, 517 (Colo. 1996). Compensatory damages for economic and non-economic losses are available to make the insured whole and, where appropriate, punitive damages are available to punish the insurer and deter wrongful conduct by other insurers. *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994); Restatement (Second) of Torts §§ 901–909 (1979). Non-economic losses recognized under the rubric of compensatory damages include emotional distress; pain and suffering; inconvenience; fear and anxiety; and impairment of the quality of life. See § 13–21–102.5(2)(b), 5 C.R.S. (2003) (defining non-economic losses); *Ballow*, 878 P.2d at 677 ("an insured suing under the tort of bad faith breach of an insurance contract is entitled to recover damages based upon traditional tort principles of compensation for injuries actually suffered, including emotional distress."); Restatement (Second) of Torts § 905 (1979).

summary judgment in its favor on Plaintiff's first claim for breach of contract.[3]

## B.   Bad Faith Breach of Contract

To succeed on a claim for common law bad faith in Colorado, a plaintiff must show that: "(1) the insurer's conduct was unreasonable and (2) the insurer had knowledge that the conduct was unreasonable or a reckless disregard for the fact that the conduct was unreasonable." *Anderson v. State Farm Mut. Auto. Ins. Co.*, 416 F.3d 1143, 1147 (10th Cir. 2005) (citing *Travelers Inc. Co. v. Savio*, 706 P.2d 1258, 1275-76 (Colo. 1985) (en banc)).  "Because of the quasi-fiduciary nature of the insurance relationship in a third-party context, the standard of conduct required of the insurer is characterized by general principles of negligence." *Goodson*, 89 P.3d at 415 (citing *Trimble*, 691 P.2d at 1142); *see Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo. 2001) (stating that in most cases of professional negligence the applicable standard must be established by expert testimony because it is not within the common knowledge and experience of ordinary persons).  "[T]he insured must show that a reasonable insurer under the circumstances would have paid or otherwise settled the third-party claim." *Goodson*, 89 P.3d at 415 (citing *Trimble*, 691 P.2d at 1142).  The reasonableness of an insurer's conduct is thus judged objectively based on industry standards. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004).

Defendant argues in part that, because there was no underlying coverage and no breach of contract, Plaintiff's bad faith claim fails. *Reply* [#55] at 39-42.  The Court disagrees with this characterization of the law, primarily because Defendant appears to

---

[3] The Court therefore need not address the alternative arguments asserted by the parties that relate purely to Plaintiff's first claim.

conflate "coverage" with "liability."  *See Response* [#52] at 29-30.  Here, there is no dispute that Defendant and Ms. Tester-Lamar entered into an insurance contract providing insurance coverage in the event that malpractice claims were made against her. Defendant, however, is really arguing that Ms. Tester-Lamar was not *liable* for any damages flowing from her alleged malpractice because, at least in part, the plaintiffs in the Pitkin County Action could not prove causation.

Defendant cites to *Markwest Hydrocarbon, Inc. v. Liberty Mutual Insurance Co.*, 558 F.3d 1184, 1192-93 (10th Cir. 2009), for the following holding: "Having concluded that the insurance companies' denial of coverage was proper as a matter of law, we must also affirm the district court's grant of summary judgment in their favor on [the plaintiff's] bad faith claim."  In *Markwest Hydrocarbon*, however, the Tenth Circuit affirmed that the underlying claim did not fall within the coverage for which the parties contracted, because that policy "explicitly provide[d] coverage only for 'all risks of direct physical loss or damage . . . *from any external cause*,' not normal wear-and-tear."  Here, the Policy covers malpractice claims, and the claims made by the plaintiffs in the Pitkin County Action were for malpractice.  Thus, *Markwest Hydrocarbon* is distinguishable from the present case. Similarly, the Court further finds that two other cases cited by Defendant are also distinguishable on the same basis as is *Markwest Hydrocarbon*: *Weitz Co., LLC v. Mid-Century Insurance Co.*, 181 P.3d 309, 315 (Colo. Ct. App. 2007) ("The claim of bad faith breach of an insurance contract was based on the insurer's refusal to defend.  Because we have concluded that the policy did not cover the claims made in the construction defect action, summary judgment was properly entered in favor of the insurer.") and *Tynan's Nissan, Inc. v. American Hardware Mutual Insurance Co.*, 917 P.2d 321, 326 (Colo. Ct.

App. 1995) (affirming summary judgment in favor of the insurance company because no coverage existed under the policy).

Defendant also cites to *South Park Aggregates, Inc. v. Northwestern National Insurance Co.*, 847 P.2d 218, 223 (Colo. Ct. App. 1992) for the holding that the insurance company's breach of "its contract with [the plaintiff] was a condition precedent to a finding of bad faith breach of an insurance contract."  The Court first notes that this statement appears to be dicta, with no accompanying analysis or citation to case law.  Second, this holding related to the issue of whether the jury properly understood or ignored the jury instructions because it awarded damages on both the plaintiff's breach of contract claim and bad faith claim, an issue that is not presently before this Court.  Third, *South Park Aggregates* was decided in 1992, prior to the Colorado Supreme Court's clarification of the law regarding bad faith breach of contract claims in *Cary* (2003) and *Goodson* (2004).  The Court therefore finds that the above-quoted statement in *South Park Aggregates* is not persuasive regarding whether Plaintiff can pursue a tortious bad faith breach of insurance contract claim in the absence of a breach of contract.

Turning to whether Defendant failed to settle in bad faith, Defendant relies on *Eklund*, the facts of which are quite similar to the present case.  *Eklund*, 579 P.2d 1185. In *Eklund*, an insured's bankruptcy trustee sued an automobile insurer for bad-faith failure to settle a claim within policy limits.  *Id.*  The insured had unequivocally directed the insurer not to settle the case even though the settlement demands were less than the policy limits. *Id.*  The court there held that the trustee could not hold the insurer liable for bad-faith failure to settle because of the insured's explicit instruction not to settle the claim.  *Id.*

Plaintiff counters *Eklund* with *Bankruptcy Estate of Morris v. COPIC Insurance*

*Company*, 192 P.3d 519. 526 (Colo. App. 2008), wherein the court distinguished the facts of *Eklund* from the similar case before it. The *Morris* court first noted several additional facts from *Eklund*. *Id.* First, the insured in *Eklund* conducted and relied on his own investigation of the accident before instructing the insurer not to settle the case. *Id.* Second, there was no indication that, had the insurer recommended settlement, the insured would have agreed. *Id.* Third, the trustee submitted no counter affidavits or depositions in response to the motion for summary judgment. *Id.*

*Morris* involved an underlying medical malpractice action in which the third party attempted to settle for the policy limits. *Id.* at 522. The insurer and the insured both declined to settle the matter until after trial had commenced, at which time the insurer's settlement offer was rejected. *Id.* at 523. Multiple counter affidavits, depositions and proffered expert opinions were submitted regarding whether the insurer adequately informed the insured of the likelihood of a plaintiff's verdict if the case went to trial, the risk of an excess verdict, the need to retain personal counsel, the availability of alternative dispute resolution, and the possibility of settling the case. *Id.* at 526. The *Morris* court found that there was evidence that the insured relied upon the insurer and defense counsel, who may have misevaluated the case. *Id.* The insured also testified that if the insurer had recommended settlement, he would have agreed to settle. *Id.* Ultimately, the *Morris* court determined that there were fact issues regarding whether the insured "was fully informed of the evidence against him, the risks of trial, and the risks of an excess verdict before trial." *Id.* Accordingly, the Colorado appellate court found that there existed issues of material fact that precluded entry of summary judgment by the lower court on the bad faith claim. *Id.* at 526-27.

Here, discovery has been divided into two phases.  Phase I concerned the issues raised in the instant Motion [#12], which was initially filed as a motion to dismiss but converted to a motion for summary judgment by the Court [#25, #26].  Phase II commenced with the completion of briefing on the present Motion [#12] and does not close until February 3, 2014.  *Minute Order* [#43].  Plaintiff asserts that there are a number of genuine issues of material fact relating to the bad faith claim:

> (1) whether OneBeacon acted unreasonably in failing to settle the underlying action within policy limits; (2) whether it failed to conduct a reasonable investigation into the underlying matter; (3) whether it failed to reasonably evaluate Ms. Tester-Lamar's exposure; (4) whether it failed to utilize its expertise to keep Ms. Tester-Lamar and the Trustee reasonably informed of the underlying proceedings; and (5) whether it acted unreasonably in failing to communicate with the Trustee after the policy became property of the bankruptcy estate.

*Response* [#52] at 2.  While Plaintiff's statements of the factual issues in this lawsuit are provided in a largely conclusory manner, the Court agrees that, at this still-early stage of the case, a critical issue of fact remains on Plaintiff's tortious bad faith breach of insurance contract claim, thus preventing entry of summary judgment in favor of Defendant.  *See Redden*, 38 P.3d at 81 (stating that in most cases of professional negligence the applicable standard must be established by expert testimony); *Morris*, 192 P.3d at 524 (stating that when conflicting evidence exists in a bad faith action against an insurer, what constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury); Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, § 12.05[b], at 1064 (16th ed. 2013) (collecting cases indicating that "[w]hether an insurer has acted in bad faith in failing to settle is generally held to be a question of fact").  *But see Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 672 (10th Cir. 2007) (holding that, despite conflicting evidence on

reasonableness of insurance company's actions, entry of summary judgment in favor of the insurance company was proper in a bad faith failure-to-settle insurance claim where no reasonable jury could conclude otherwise).

The ultimate question of fact here is whether the insurer acted in bad faith. For example, some of the facts asserted by the parties that may inform the finder of fact regarding (1) the reasonableness of Defendant's settlement conduct and/or (2) whether Defendant had knowledge of the alleged unreasonableness or recklessness of its settlement conduct, see Anderson, 416 F.3d at 1147, are as follows:[4]

(1) Ms. Tester-Lamar had problems with drugs and alcohol throughout the time she represented Ms. Ferer and ChrisPat, Response [#52] at 3;

(2) While Ms. Tester-Lamar was in rehabilitation, Ms. Ferer and many other clients who called or emailed during that period were given misleading information about Ms. Tester-Lamar's whereabouts and the progress on their respective cases, such as, for example, when Ms. Tester-Lamar told Ms. Ferer that she was preparing for an arbitration when, instead, Ms. Tester-Lamar was preparing to enter a rehabilitation program for drug and alcohol abuse and had not properly commenced the arbitration process, Pl.'s Ex. 5, Depo. of D'Arcy [#52-5] at 116-118; Pl.'s Ex. 7, Various August 2008 Emails [#52-7];

(3) Ms. Tester-Lamar surrendered her license to practice law in a stipulated admission of misconduct, Pl.'s Ex. 8, Admission of Misconduct [#52-8];

(4) Ms. Ferer was forced to represent herself and ChrisPat at a pretrial hearing in the Fenton Action, Pl.'s Ex. 9, Dec. 8, 2008 Hearing Transcript [#52-9];

(5) Also in the Fenton Action, Ms. Tester-Lamar allegedly failed to adequately coordinate experts, and the court limited the retention of new experts after it imposed sanctions, Pl.'s Ex. 10, Disclosure of Expert Opinions [#52-10]; Pl.'s Ex. 11, Expert Report of Gray [#52-11];

(6) After filing the complaint and making initial disclosures in the Pitkin County Action, Ms. Ferer and ChrisPat made a time-limited demand to settle their claims

---

[4] These facts are either undisputed or, in certain cases, only the extent of the fact (such as the extent of Ms. Tester-Lamar's drug and alcohol problems) is in dispute.

against Ms. Tester-Lamar and the Firm for the Policy's remaining limits, despite having identified damages in excess of $2,000,000, *see Pl.'s Ex. 13, Demand Letter* [#52-13]; *Pl.'s Ex. 14, Initial Disclosures* [#52-14];

(7) Throughout the Pitkin County Action, Ms. Tester-Lamar was "strongly opposed" to settlement, *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶ 4;

(8) Ms. Tester-Lamar specifically instructed Defendant to reject Ms. Ferer's and ChrisPat's first $1,000,000 settlement offer, *id.*;

(9) Defendant did not respond to the first settlement offer, *Pl.'s Ex. 15, Rule 30(b)(6) Depo. of Def.* [#52-15] at 95-96;

(10) In the Pitkin County Action, Ms. Ferer and ChrisPat provided supplemental disclosures in 2010 and 2011 to Ms. Tester-Lamar and the Firm demonstrating damages in excess of $4,600,000, a sum which was in line with Ms. Tester-Lamar's prior valuation of the Fenton and Gibson Actions, *Response* [#52] at 6*; Pl.'s Ex. 16, Notice of Claim filed by Ms. Tester-Lamar* [#52-16];

(11) Ms. Ferer and ChrisPat again offered to settle their claims for $1,000,000, but Ms. Tester-Lamar again instructed Defendant to reject the settlement offer, and Defendant again did not respond to the offer, *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶ 5; *Pl.'s Ex. 15, Rule 30(b)(6) Depo. of Def.* [#52-15] at 95-96; *Pl.'s Ex. 17, Statutory Offer of Settlement* [#52-17];

(12) Ms. Tester-Lamar's retained counsel advised Defendant in three separate reports that it believed that Defendant had potential exposure in excess of the Policy limits based on Ms. Tester-Lamar's and the Firm's violation of several canons of ethics and other duties owed to Ms. Ferer and ChrisPat, *Pl.'s Ex. 18, Claim Reports* [#52-18];

(13) Ms. Tester-Lamar's retained counsel noted that Ms. Tester-Lamar's conduct "[c]ould prove problematic at trial, as there is a real risk a jury could construe her misconduct as prima facie proof of malpractice," *id.* at 15;

(14) Ms. Tester-Lamar's retained counsel believed that the jury would return a defense verdict, but he also informed Defendant that if the jury found in favor of Ms. Ferer and ChrisPat, the verdict could exceed the Policy limits, *id.* at 17;

(15) Ms. Tester-Lamar at no time believed that she had any liability to Ms. Ferer or ChrisPat or that she was exposed to an adverse judgment in excess of the Policy limits, *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-2] ¶¶ 6-7;

(16) Ms. Tester-Lamar stated that her bankruptcy filing was not made as a result of the Pitkin County Action, *id.* ¶ 11;

(17) Ms. Tester-Lamar did not believe that she or Plaintiff as trustee ever had any claims against Defendant for breach of contract, bad faith breach of contract, or violation of any statute based on Defendant's handling of the Pitkin County Action, *Def.'s Ex. B, Aff. of Tester-Lamar* [#12-1] ¶¶ 8, 15; and

(18) Ms. Tester-Lamar did not suffer any emotional distress or other mental anguish as a result of Defendant's handling of that l, *id.* ¶ 9.

These facts demonstrate that the ultimate question of fact, *i.e.*, whether Defendant acted reasonably, is still in dispute.  The parties have presented opposing facts to support their positions on this question and, at this stage of the proceeding, the Court finds that a reasonable jury would not be constrained to reach the conclusion that bad faith did not occur.  Therefore, the Court finds that a genuine issue of material fact exists as to Plaintiff's second cause of action and that summary judgment is inappropriate.

Accordingly, the Court **recommends** that Defendant's Motion seeking entry of summary judgment on Plaintiff's claim for tortious bad faith breach of insurance contract be **denied without prejudice**.

## IV.  Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that the Motion [#12] be **GRANTED in part and DENIED without prejudice in part**.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal

questions.  *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).   A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.   *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: August 23, 2013

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge